## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

FUJITEC AMERICA, INC., et al.,                           Case No. 1:18-cv-635
     Plaintiffs,                                       Litkovitz, M.J.

     vs.

AXIS SURPLUS INSURANCE COMPANY,                **ORDER**
     Defendant.

## I. Introduction

Plaintiffs Fujitec America, Inc. (Fujitec) and Travelers Property Casualty Company of America (Travelers) originally filed this action in the Warren County, Ohio Court of Common Pleas. (Doc. 1, Exh. 2). Defendant AXIS Surplus Insurance Company (AXIS) removed the action to this Court based on its diversity jurisdiction under 28 U.S.C. § 1332(a)(1). (Doc. 1). Plaintiffs originally brought claims against AXIS for declaratory judgment and breach of contract. The claims arose out of AXIS's alleged refusal to defend a state court action alleging personal injury claims for commercial general liability (CGL) insurance, which exceeded Travelers' claimed coverage limit; AXIS's alleged refusal to pay "post-exhaustion" judgments and settlements[1]; and AXIS's alleged refusal to reimburse Fujitec and/or Travelers for all costs and expenses they have incurred in the defense of post-exhaustion claims and/or post-exhaustion judgments that exceed the claimed limit of Travelers' coverage. This matter is before the Court on (1) plaintiffs' motion for summary judgment (Doc. 25), defendant AXIS's opposing memorandum (Doc. 33), and plaintiffs' reply (Doc. 34); and (2) defendant AXIS's cross-motion

---

[1] "Post-exhaustion" means the coverage limits under an insurance policy Travelers issued to Fujitec had been exhausted.

for summary judgment (Doc. 29), plaintiffs' opposing memorandum (Doc. 32), and AXIS's

reply (Doc. 35).

## II. Undisputed facts

### 1. The underlying claim

Plaintiff Travelers is an insurance company authorized to do business in the State of

Ohio. (Doc. 4, ¶¶ 1, 2). Plaintiff Fujitec, which is headquartered in Mason, Ohio, manufactures,

installs, and services elevators and moving walkways in the United States. (Doc. 25, Darryl

Mitchell Affidavit, Exh. 2, ¶ 3). Fujitec New York is a division of Fujitec. (*Id*., Exh. 2, ¶ 4). On

or about November 8, 2008, Fujitec New York entered into a Master Service Agreement (MSA)

with "FNYP as agent for FC Eighth Avenue, LLC" to maintain and repair the elevators identified

in Exhibit B to the MSA. (*Id*., Exh. 3). These included Elevator P14 in "The New York Times

Building" (NYT Building) located at 620 8th Avenue, New York, New York. (*Id*.). The MSA

identifies Fujitec as a "contractor." (*Id*.). Fujitec's obligations under the MSA were to "furnish

maintenance service" on "Equipment" governed by the MSA, which included Elevator P14. (*Id*.,

§ 1; *see Id*., Exh. B). Fujitec was contractually obligated to "maintain elevator Equipment"

described in the contract and use "all reasonable care to see that Equipment is maintained in

proper operating condition"; to "regularly examine, maintain, lubricate, adjust, clean as required,

and, if in [Fujitec's] reasonable judgment the conditions warrant it, repair or replace all elevator

components, unless specifically excluded elsewhere"; and to "maintain the existing performance

of Equipment." (*Id*., § 2, Exh. C). The MSA listed the specific items for which Fujitec had

"[m]aintenance, repair and replacement" responsibility. *Id*.

In 2012, Robert E. Shannon, Jr., an engineer employed by a tenant in the NYT Building,

filed a lawsuit against Fujitec and other parties arising out of an incident that occurred on

December 30, 2011 (Shannon action).  Shannon claims that after he entered Elevator P14 on that date, the elevator fell almost 30 floors before coming to a hard stop.  (Doc. 27, Shannon 8/27/12 depo. at 9-10, 46-51).  According to plaintiffs, Shannon claims that he suffered multiple serious injuries.  (*Id*., citing Shannon 8/27/12 depo. at 46-51).  A post-incident inspection of Elevator P14 disclosed that one of the elevator's hoist cables had broken.  (Doc. 28, Sean Kennedy depo. at 78-79).

Fujitec provided monthly maintenance on Elevator P14 in the NYT Building.  (Doc. 26, Michael Day depo. at 8[2]; Doc. 25, Exh. 5, Anthony Carlo Affidavit, ¶ 2).  Under the MSA, repairs to the elevators are performed as needed and are recorded on tickets if made in response to a call.  (Doc. 26, Day depo. at 8).  Fujitec's responsibilities under the MSA included maintenance, inspection of the cables, and replacement of the cables when necessary.  (Doc. 28, Kennedy depo. at 67, 78).  Cables are inspected when elevator maintenance is performed (*Id*. at 67) and are occasionally replaced because of excessive wear or broken strands (Doc. 26, Day depo. at 22).  Day, a Fujitec elevator mechanic assigned to the NYT Building at the time of the Shannon accident, inspected the cable involved in the Elevator P14 accident prior to December 30, 2011.  (Doc. 26, Day depo. at 3, 11, 16).  Fujitec's records show that no repairs were performed on Elevator P14 from June 30, 2011 to December 29, 2011.  (Doc. 25, Carlos Aff., Exh. 5, ¶ 3).  Sean Kennedy, a Fujitec maintenance technician who was covering for Day at the NYT Building on the day of the Shannon incident and for the prior four days, did not perform any maintenance on Elevator P14 and did not inspect the elevator prior to the incident.  (Doc. 28, Kennedy depo. at 19-20, 24-25).  Elevator P14 was not undergoing maintenance or repair and

---

[2] The page numbers provided for the depositions reflect the page numbers of the documents as they appear on the Court's docket.  For instance, pages 25, 26, 27 and 28 of Day's deposition appear as a single page on the Court's docket and are cited as Doc. 26 at 8.

was in use as a regular passenger elevator when it fell on December 30, 2011.  (Doc. 25, Exh. 5, Carlos Aff., ¶ 4).

### 2. The Travelers Policy

Travelers issued to Fujitec at its Mason, Ohio address a primary insurance policy, No. TC2J-GLSA-134D4544-TIL-11 (Travelers Policy).  (Doc. 4, Exh. A).  The policy period was March 31, 2011 to March 31, 2012.  The Travelers Policy provided CGL coverage.  (*Id*., ¶ 4). The "[CGL] Coverage Form" of the Travelers Policy lists three types of coverage under "Section I-Coverages."  (*Id*., Exh. A at 15).  The first is "Coverage A Bodily Injury and Property Damage Liability."  (*Id*.).  The Travelers Policy states that coverage will be provided for bodily injury and property damage as follows:

1. Insuring Agreement

> a. We [Travelers] will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply.  We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result. But:
>
> > (1) The amount we will pay for damages is limited as described in Section III- Limits of Insurance; and
> > (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.
> >  . . . .
>
> b. This insurance applies to 'bodily injury' and 'property damage' only if:
>
> > (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence" that takes place in the 'coverage territory';
> > (2) The 'bodily injury' or 'property damage' occurs during the policy period; . . . .

*Id*.

4

Under the Travelers Policy, "[CGL] Coverage is Subject to a General Aggregate Limit." (*Id*., Exh. A at 13).  The "General Aggregate Limit (Other than Products-Completed Operations)" is $15 million.  (*Id*.).  The "Products-Completed Operations Aggregate Limit" is $2 million.  (*Id*.).  The "Each Occurrence Limit" is $1 million.  (*Id*.).

The "Insuring Agreement" provides under "Section I-Coverages" that Travelers will cover damages for "bodily injury" that is caused by an "occurrence" in the "coverage territory." (*Id*. at 15, § 1(a)).  Travelers has the right and duty to defend against a suit seeking damages for bodily injury, but the right and duty to defend end when Travelers has "used up the applicable limits of insurance in the payment of judgments or settlements" or medical expenses under the applicable "Coverages."  *Id*.   "Section III-Limits of Insurance," as referenced in § 1(a)(1) of the "Insuring Agreement," provides at ¶ 3: "The Products-Completed Operations Aggregate Limit [$2 million] is the most [Travelers] will pay under Coverage A for damages because of 'bodily injury' and 'property damage' included in the 'products-completed operations hazard.'"  (*Id*., Exh. A at 24).  "Section V-Definitions" at ¶ 16 defines "[p]roducts-completed operations hazard" as follows:

> a. Includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent arising out of 'your product' or 'your work' except:
>
> (1)  Products that are still in your physical possession; or
> (2)  Work that has not yet been completed or abandoned.  However, 'your work' will be deemed completed at the earliest of the following times:
>
> (a)  When all of the work called for in your contract has been completed.
> (b)  When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
> (c)  When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
>
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(*Id*. at 28-29). Paragraph 22 defines "[y]our work" as used in ¶ 16(a)(2) to:

    a. Mean[]:

        (1) Work or operations performed by [Fujitec] or on your behalf; and
        (2) Materials, parts or equipment furnished in connection with such work or operations.

    b. Includes:

        (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work,' and
        (2) The providing of or failure to provide warnings or instructions.

(*Id*. at 29-30).

      Thus, under the Travelers Policy, a claim for bodily injury falls within the products-completed operations hazard, and is subject to the $2 million Products-Completed Operations Aggregate Limit, if the following criteria are met: (1) the claim is for bodily injury; (2) arising out of the insured's "product" or "work"; (3) which occurred at premises not owned or rented by Fujitec; and (4) the work which caused the bodily injury had been "completed," which under the Travelers Policy is defined as occurring at the *earliest* of the following times: (a) "When all of the work called for in [a governing] contract has been completed"; (b) "When all of the work to be done at the job site has been completed if [the] contract calls for work at more than one job site"; or (c) "When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project." (*Id*. at 28-29, Section V, ¶ 16(a))(emphasis added). If work was "otherwise complete" under any of these provisions at the time of the bodily injury, then the fact that the work "may need service, maintenance, correction, repair or replacement" does not alter the nature of the work and take it out of the "products-completed operations hazard." (*Id*.). The work will

nonetheless be "treated as completed" and a claim for bodily injury allegedly caused by the work will remain subject to the $2 million "Products-Completed Operations Aggregate Limit." (*Id.*)

### 3. The AXIS Policy

Defendant AXIS is an insurance company authorized to do business in the State of Ohio. (Doc. 4, ¶ 3). AXIS issued to Fujitec at its Mason, Ohio address an insurance policy, No. EAU734900/01/2011 (AXIS Policy).[3] (*Id.*, ¶ 5). The policy period was March 31, 2011 to March 31, 2012. The AXIS Policy provided excess liability coverage for amounts that exceeded Fujitec's primary insurance coverage. (*Id*). The AXIS Policy provides in the "Insuring Agreement" that AXIS will pay "excess insurance" under the following conditions:

> [AXIS] will pay those sums in excess of the 'underlying insurance' that you become legally obligated to pay as damages because of injury or damage . . . to which this insurance applies, provided that the 'underlying insurance' also applies, or would have applied but for the exhustion of the applicable Limits of Insurance.

(Doc. 25 at 5-6). "Underlying insurance" is defined in pertinent part under "Section VI-Definitions" of the AXIS Policy as "the policy or policies of insurance listed in the Declarations under the Schedule of Underlying Insurance [Schedule A] . . . ." (*Id.* at 6). The policies of insurance listed in the Declarations under Schedule A include the Travelers Policy (Item 8), which as noted *supra* has a $1 million Each Occurrence Limit that is subject to a $15 million General Aggregate Limit, and a $2 million Products-Completed Operations Aggregate Limit. (Doc. 25 at 6).

The "Insuring Agreement" of the AXIS Policy also provides that AXIS will pay "necessary defense expenses" for covered claims if the underlying insurance has been exhausted. (Doc. 25 at 6). It states in relevant part:

---

[3] Plaintiffs assert that a copy of the AXIS Policy "was attached to the Complaint as Exhibit B" (Doc. 25 at 5), but the AXIS Policy is not attached to the complaint filed in this Court.

> If all 'underlying insurance' has been exhausted by payment of damages, then we will pay the necessary defense expenses for other such claims, suits or proceedings to which this insurance applies.

(*Id.*).

### 4. The parties' coverage dispute

On June 20, 2018, Travelers notified AXIS that it had exhausted its $2 million Products-Completed Operations Aggregate Limit of the Travelers Policy by settlement payments to bodily injury claimants. (Doc. 25 at 4). On July 25, 2018, Travelers formally tendered to AXIS Fujitec's defense and indemnity obligations with respect to unresolved claims that were subject to the exhausted Products-Completed Operations Aggregate Limit. (*Id.*). Travelers also demanded reimbursement of the sum of $947,674.54 that Travelers had paid in excess of the $2 million Products-Completed Operations Aggregate Limit of the Travelers Policy to settle a pending claim that Travelers maintained was subject to that aggregate limit. (Doc. 25, Affidavit of Kevin Hayes, Exh. 1, ¶¶ 4, 5, 6). AXIS refused to pay the sum, which led Travelers to file this action in state court seeking a declaratory judgment and reimbursement of damages against AXIS. Subsequently, AXIS reimbursed Travelers the sum of $947,674.54 that Travelers had paid in excess of the $2 million Products-Completed Operations Aggregate Limit. (*Id.*, Exh. 1, ¶ 7). AXIS also assumed the defense of, and potential indemnity obligations in, one of the two unresolved lawsuits against Fujitec that had not been settled by Travelers. (*Id.*).

AXIS continues to dispute Traveler's classification of the second unresolved claim, *Robert E. Shannon, Jr. v. The New York Times Building, LLC, et al.*, Index No. 150709/12 (Shannon action), which is pending in the Supreme Court of the State of New York. (Doc. 25 at 4). AXIS maintains that the claim at issue in the Shannon action is subject to the $15 million General Aggregate Limit of the Travelers Policy, which has not been exhausted. AXIS contends

that for this reason, it has no defense or indemnity obligations in the Shannon action.  Travelers contends that the Shannon action is subject to the $2 million Products-Completed Operations Aggregate Limit of the Travelers Policy, which has been exhausted.

Thus, the crux of the parties' dispute is which aggregate limit in the Travelers Policy applies: the $15 million General Aggregate Limit, or the $2 million Products-Completed Operations Aggregate Limit.  Resolution of this issue will determine whether Travelers' primary liability coverage for underlying bodily injury claims has been exhausted.  The issue of which aggregate limit applies depends on the interpretation of the products-completed operation hazard provision of the Travelers Policy.  More specifically, the issue turns on whether Fujitec's "work" that allegedly gave rise to the bodily injury as claimed by Shannon had been "completed" as defined under the provision.

### III.  Motions for summary judgment

#### 1.  Summary judgment standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)*; Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  A grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002).  The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249.

### 2. Law governing Ohio insurance contracts

In cases like this where federal jurisdiction is based on diversity of citizenship, the Court applies the substantive law of the state in which the district court sits according to the decisions of the state's highest court. *Perry v. Allstate Indem. Co.*, 953 F.3d 417, 421 (6th Cir. 2020) (citing *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013)). Here, the substantive law of Ohio applies because this case turns on an insurance contract governed by Ohio law. *Id.*; *Richelson v. Liberty Ins. Corp.*, 796 F. App'x 277, 280 (6th Cir. 2020). The Travelers Policy and AXIS Policy were both issued to Fujitec, a corporation residing in Ohio, at its Ohio headquarters. (Doc. 25 at 12, n. 2). The Court must therefore look to the decisions of the Ohio Supreme Court to interpret the policy language. *Perry*, 953 F.3d at 421. If the Ohio Supreme Court has not spoken on an issue, the Court looks "to the decisions of [Ohio's] lower courts, to the extent they are persuasive, to predict how the Ohio Supreme Court would decide the issue." *Id.* (citing *Kepley*, 715 F.3d at 972; *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)). If the case law does not provide a clear answer, the Court must look to "Ohio's general rules of contract interpretation and insurance law." *Perry*, 953 F.3d at 421.

The basic elements of a breach of contract under Ohio law are "the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Richelson*, 796 F. App'x at 281 (quoting *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018)). A party breaches a contract if it "fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions." *Savedoff v. Access Group, Inc.,* 524 F.3d 754, 762 (6th Cir. 2008) (citing *Jarupan v. Hanna*, 878 N.E.2d 66, 73 (Ohio App. 10th Dist. 2007)).

Ohio courts construe written contracts as a matter of law. *Id.* at 763. The court's role in interpreting a contract is to "give effect to the intent of the parties." *Goodyear Tire and Rubber Co. v. Lockheed Martin Corp.*, 622 F. App'x 494, 497 (6th Cir. 2015) (citing *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011)). The court reads the contract as a whole and interprets the words of the contract "according to their plain meaning." *Richelson*, 796 F. App'x at 281 (quoting *Boone Coleman Constr., Inc. v. Piketon*, 50 N.E.3d 502, 515 (Ohio 2016)). Where insurance policy "language sets forth the relevant coverages and exclusions in unambiguous terms, [the court] must apply the terms as written according to their plain and ordinary meaning." *Bondex Intern., Inc. v. Hartford Acc. and Indem. Co.*, 667 F.3d 669, 677 (6th Cir. 2011) (citing, e.g., *Cincinnati Indem. Co. v. Martin*, 710 N.E.2d 677, 679 (Ohio 1999); *Monticello Ins. Co. v. Hale*, 114 F. App'x 198, 201 (6th Cir. 2004)). "Specialized definitions provided in the policy govern notwithstanding their ordinary meaning." *Id.* (citing, e.g., *United Nat'l Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 450 (6th Cir. 1999)).

Where an exclusion to coverage is at issue, the insurer bears the burden under Ohio law of demonstrating that the insurance claim falls within the exclusion to coverage. *Id.* (citing, e.g., *Cont'l Ins. Co. v. Louis Marx Co.*, 415 N.E.2d 315, 317 (Ohio 1980); *St. Marys Foundry, Inc. v. Emp'rs Ins. of Wausau*, 332 F.3d 989, 992-93 (6th Cir. 2003)). Further, any ambiguous policy terms with competing reasonable interpretations must be construed in favor of the insured. *Perry*, 953 F.3d at 421 (citing *Andersen v. Highland House Co.*, 757 N.E.2d 329, 332-33 (Ohio)). To establish ambiguity, the insured must provide a reasonable alternative understanding of the relevant policy language. *Bondex Intern., Inc.*, 667 F.3d at 677 (citing *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008)). Once ambiguity is shown, the insurer cannot then prevail simply by demonstrating that "its interpretation is more reasonable than the

policyholder's." *Perry*, 953 F.3d at 421 (quoting *Andersen*, 757 N.E.2d at 333) (quotation omitted)). To defeat coverage, the insurer must show that the interpretation it favors "is *the only one* that can fairly be placed on the language in question." *Id.* (quoting *Andersen*, 757 N.E.2d at 332) (quotation omitted) (emphasis added by *Perry*).

Only if the contract is ambiguous can the court consider extrinsic evidence to ascertain the parties' intent. *California Fitness I, Inc. v. Lifestyle Fam. Fitness, Inc*., 433 F. App'x 329, 341 (6th Cir. 2011) (citing *Allason v. Gailey*, 939 N.E.2d 206, 212 (Ohio App. 7th Dist. 2010)). The court may consider extrinsic evidence "to interpret, but not to contradict, the express (ambiguous) language." *Bondex Intern., Inc.*, 667 F.3d at 680 (citing Ohio cases).

### 3. The parties' arguments

Plaintiffs argue that the Shannon action fits the definition of a products-completed operations hazard claim under the Travelers Policy. (Doc. 25). Plaintiffs assert that the Shannon claim is therefore subject to the $2 million Products-Completed Operations Aggregate Limit of the Travelers Policy, which has been exhausted. (*Id*.). Plaintiffs argue that the Shannon action presents a claim for "bodily injury"; which occurred "away from premises [Fujitec] own[s] or rent[s]"; the bodily injury arose out of "[Fujitec's] product [P14 elevator manufactured by Fujitec]" or "Fujitec's work [scope of [MSA]]"; and the bodily injury occurred after Elevator P14 had been put to its intended use. (*Id*. at 10). Plaintiffs contend that AXIS must "now defend and indemnify Fujitec with respect to the Shannon action and it must repay Travelers for its expenses in defending Fujitec after the date of tender of defense of the Shannon Action to A[XIS]." (*Id*. at 18). Travelers claims that these expenses total $129,283.64 to date. (*Id*., citing Exh. 1, ¶ 9).

Plaintiffs dispute AXIS's reason for denying coverage to Travelers, i.e., that the Shannon action does not involve a products-completed operations hazard because Fujitec's work "has not yet been completed or abandoned."  (*Id*. at 10).  Plaintiffs argue that AXIS's reason contradicts the express language of the Travelers Policy, which states in pertinent part: "Fujitec's work 'will be deemed completed at the earliest of the following times:. . . (c) when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.'"  (*Id*.).  Plaintiffs further assert that the Travelers Policy makes clear that "work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."  (*Id*.).  Plaintiffs argue that case law supports their position that Fujitec's work was "complete" when the Shannon accident occurred, including the only Ohio decision to have addressed the issue: *Fujitec America, Inc. v. Arch Specialty Insurance*, Case No. 14CV85245 (Warren County, Ohio Common Pleas Court, Aug. 24, 2015).  (Doc. 25, Exh. 4).

Plaintiffs argue that cases from other jurisdictions that have construed similar "completed operations" language support their position.  (Doc. 25 at 12-16, citing *Fireman's Fund Ins. Co. v. Zurich Am. Ins. Co.*, No. 10-CV-429, 2011 WL 2937421, at *1 (E.D. Pa. July 19, 2011); *Zurich Ins. Co. v. Principal Mut. Ins. Co.*, 761 A.2d 344, 345 (Md. Spec. App. 2000); *Trizec Properties, Inc. v. Millar Elevator Serv. Co.*, No. 203144, 1999 WL 33452700, at *1 (Mich. App. Mar. 26, 1999); *James v. Hyatt Corp. of Delaware*, 981 F.2d 810 (5th Cir. 1993)).  Plaintiffs contend that Ohio case authority is in accord with these decisions.  (*Id*. at 15-16, citing *Hoover v. Sumlin*, No. 7570, 1982 WL 3725 (Ohio App. 2nd Dist. April 21, 1982)).  Plaintiffs further argue that even though a Fujitec employee was onsite daily at the NYT Building to perform maintenance on one or more of the building's elevators, Fujitec's maintenance work at the site was nonetheless

completed and the elevator had been put to its intended use at the time of Shannon's accident so as to fall within the products-completed operations hazard classification. (*Id*. at 17-18, citing *Liberty Mut. Fire Ins. Co. v. St. Paul Fire and Marine Ins. Co.*, 842 N.E.2d 170, 172 (Ill. App. 1st Dist. 2005); Doc. 32 at 9).

AXIS argues that based on the underlying nature of the Shannon claim and the scope of Fujitec's MSA with the NYT Building's agent, the Shannon action does not "trigger an indemnity obligation" for a products-completed operations hazard under the Travelers Policy. (Doc. 29 at 10, 17). AXIS contends that the Shannon action instead falls under the CGL coverage of the Travelers Policy, for which the $15 million General Aggregate Limit has not yet been exhausted. (*Id*. at 3). AXIS argues that the Shannon claim does not fall under the products-completed operations hazard of the Travelers Policy because Fujitec's "contractual obligations" under the MSA were not complete when the Shannon accident occurred. (*Id*. at 11-12). AXIS specifically argues that Fujitec's "contractual obligation to inspect and provide needed repairs to work equipment" as outlined in the MSA, and in particular Fujitec's obligation to "repair, and replace worn out equipment under the terms of the [MSA]," had not been completed. (*Id*. at 12, 17). AXIS alleges that Fujitec had ongoing "contractual obligations" to "inspect, repair, and replace worn out equipment under the terms of the [MSA]," and this work was not "complete" as of Fujitec's last inspection of the equipment prior to the Shannon accident. (*Id*. at 17). AXIS argues that because Travelers "had not completed all of the work called for in the service contract," no subsection of the products-completed operations hazard applies. (*Id*. at 20). As authority for its position, AXIS relies on the Sixth Circuit's decision in *McNally v. American States Ins. Co.*, 308 F.2d 438 (6th Cir. 1962) and the decision in *Bituminous Cas. Corp. v. R & O*

*Elevator Co.*, 293 F.2d 179, 183 (8th Cir. 1961).[4] (Doc. 29 at 17-21). AXIS argues that the Ohio court's decision in *Arch Specialty Insurance*, Case No. 14CV85245, which plaintiffs rely on is not dispositive of the issue before this Court.

In response, plaintiffs argue that the Sixth Circuit's decision in *McNally* is inapposite. (Doc. 32 at 2-4). Plaintiffs contend that courts in other jurisdictions have construed the standard language at issue in the Travelers Policy to be unambiguous. Plaintiffs assert those cases clearly support plaintiffs' interpretation of the language at issue: i.e., if Fujitec's "work has been put to its intended use" - as it had been before the Shannon accident - "before all the work called for in the service contract had been performed," then the work is "deemed completed." (*Id.* at 4-5, citing *Goodwin v. Wright*, 100 Wash. App. 631, 643-44 (2000); *Arch Specialty Insurance*, Case No. 14CV85245; *James*, 981 F.2d 810). Plaintiffs argue that Fujitec's "ongoing obligations . . . under the [MSA] . . . do not alter this result" in light of language in the products-completed operations hazard which states: "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." (*Id.* at 5). Plaintiffs contend that the language in the Travelers Policy is unambiguous and clearly defines when an insured's work or operation must be treated as completed.

**4. Analysis**

Neither party has cited a decision of the Ohio Supreme Court that interprets policy language which is identical or substantially similar to that found in the products-completed operations hazard provision of the Travelers Policy. The Court must therefore look to the decisions of Ohio's lower courts and, to the extent those decisions are persuasive, "predict how

---

[4] AXIS also relies on the district court's decision in *Younglove Const., LLC v. PSD Dev., LLC*, 724 F. Supp. 2d 847 (N.D. Ohio 2010). (Doc. 29 at 12). However, the district court vacated its opinion on reconsideration. *Id.*, *opinion vacated on reconsideration,* 767 F. Supp. 2d 820 (N.D. Ohio 2011). Thus, the *Younglove* decision cited by AXIS is not good authority.

the Ohio Supreme Court would" interpret the policy language.  *Perry*, 953 F.3d at 421.  If the case law does not provide a clear answer, the Court must look to "Ohio's general rules of contract interpretation and insurance law."  *Id.*  In this case, the Court finds that Ohio case law provides a "clear answer" to how the policy language at issue should be interpreted.

Plaintiffs allege that the only Ohio case they are aware of that addresses the issue raised here is the August 2015 Ohio Common Pleas Court decision in *Arch Specialty Insurance*, Case No. 14CV85245.  (Doc. 25, Exh. 4).  The issue in *Arch Specialty Insurance* was whether the same "products-completed operations hazard" coverage at issue here applied and gave rise to the defendant's duty to defend and provide coverage for all litigation after one of the two plaintiffs in that case, Travelers, had exhausted coverage of $2 million under that portion of its policy. The *Arch Specialty Insurance* case involved claims against Fujitec for damages related to bodily injuries allegedly covered by two commercial liability policies.  First, the plaintiff Travelers had issued a commercial general liability insurance policy to the plaintiff Fujitec.  Second, defendant Arch Specialty Insurance had issued a commercial umbrella liability policy to Fujitec.  Both policies had a policy period of March 31, 2008 to March 31, 2009.  Both policies defined the covered "products-completed operations hazard" as including all "'bodily injury' . . . occurring away from premises [Fujitec] own[s] or rent[s] arising out of 'your product' or 'your work' except: (1) Products that are still in your physical possession; or (2) Work that has not yet been completed or abandoned."  (*Id*.).  Both policies also stated, "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete will be treated as completed."  *Id*. at 4-5.  The Commercial General Liability Coverage Part Declarations of the Travelers policy set a $2 million Products-Completed Operations Aggregate Limit.  The plaintiffs claimed that once Fujitec became legally obligated to pay damages in excess of $2

million, Arch Specialty Insurance's coverage applied because the damages were for alleged bodily injury included in the "products-completed operations hazard." *Id*. at 2-3.  The defendant argued that the "work or 'operations' were not completed at the time of the alleged bodily injuries" because "Fujitec had maintenance or service contracts in effect when the bodily injuries allegedly occurred." *Id*. at 3.

The state court analyzed whether "equipment with uncompleted maintenance agreements is included in the 'products-completed operations' definition." *Id*. at 4.  The court found the Travelers policy language was not ambiguous and the "definitions clearly include the situations" such as those at issue in the case. *Id*. at 6.  Specifically, the policy stated that "work that may need service, maintenance, correction, repair or replacement will be treated as completed," and "the definition of 'products-completed operations hazard' also describes provides [sic] coverage when 'that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.'" *Id*. The court found that "the products that resulted in injury, were all completed and being put to their intended use and were only being serviced and maintained but were otherwise complete at the time of the injuries." *Id*.  Therefore, the court held that the "products-completed operations hazard" applied and that the plaintiffs were entitled to judgment on their claims.  (*Id*.).

Plaintiffs argue that *Arch Specialty Insurance* applies here as precedential and persuasive authority.  (Doc. 32 at 6-7).  Plaintiffs allege that the state court "unqualifiedly dismissed" the same argument AXIS presents here in its motion for summary judgment: "that Fujitec's ongoing obligations under the [MSA] rendered its work 'not completed' under the products-completed operations hazard definition." (*Id*.).  Plaintiffs argue that the state court's failure to consider the facts of any individual claim is immaterial because the state court resolved the same argument

17

that underlies AXIS's position in this case, which is that "because Fujitec had maintenance or service contracts in effect at the time of the alleged bodily injuries, the work or 'operations' were not completed at the time of the alleged bodily injuries." (Doc. 32 at 7, citing *Arch Specialty Insurance*, Case No.14CV85245, at 3). Plaintiffs argue that here, the work on the elevator "clearly was complete" under the express language of subsection (2)(c) of the "products-completed operations hazard definition." (Doc. 32 at 9). Plaintiffs contend "the elevator at issue had been inspected and maintained by Fujitec before the accident and that such work on the elevator had been put to its intended use at the time of Shannon's accident." (*Id*.). Plaintiffs argue: "The fact that the elevator was the subject of a service agreement does not change that fact – as the Travelers Policy language specifically states that 'work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as complete.'" (*Id*.).

AXIS challenges plaintiffs' reliance on the state court's holding in *Arch Specialty Insurance* on three grounds. First, AXIS argues that *Arch Specialty Insurance* is not dispositive of plaintiffs' claim here because the state court's initial summary judgment decision focused on the impact of "the existence of a service contract alone" and did not consider the policy as applied to a specific claim. (Doc. 33 at 1-2). AXIS argues that the state court issued a subsequent decision in the case declining to consider "the argument sought to be raised by Arch relative to the unique facts of a specific claim," instead finding that Arch had waived its argument. (*Id*. at 2).

AXIS also argues that the state court did not give "proper deference to all of the relevant policy language" in determining how the "products-completed operations hazard" provision

applied there. (*Id*. at 2-3). AXIS argues that the state court improperly focused on subsection

(2)(c) of the provision, under which an insured's work may be deemed "completed"

> [w]hen that part of the work done at a job site has been put to its intended use by
> any person or organization other than another contractor or subcontractor working
> on the same project.

(*Id*. at 3). AXIS asserts the state court's reliance on this provision "in the context of Fujitec's

provision of services under an elevator service contract is facially problematic. . . ." (*Id*.). AXIS

alleges this subsection is "obviously designed to apply in situations where an insured's work is

performed on a 'job site' that involves multiple components (i.e. a large construction site

involving multiple sections or stages.)" (*Id*.). AXIS alleges in such a scenario, a completed

section of a job that has been put to its intended use can be deemed complete even though other

sections remain uncompleted. (*Id*.). AXIS argues that subsection (2)(c) does not logically apply

to a situation like the one presented here, when the "work" involved is defined under a service

contract as to "maintain and repair elevators . . . including repairs, parts, and supplies," and

where Fujitec "performed no 'work' on a part of the project" that allegedly was the proximate

cause of the injury. (*Id*. at 3, citing Doc. 25, Exh. 3). AXIS alleges that here, no completed

"part" of the job was put to its intended use as of the date of the Shannon accident and Fujitec

had never performed any "work," which AXIS defines as "repairs," on the "elevator equipment"

that allegedly caused Shannon's injury. (*Id*. at 3). AXIS contends that because no work was

ever completed on Elevator P14, the products-completed operations hazard does not apply. (*Id*.

at 4, citing *Am. Family Ins. Co. v. Apt. Builders, LP*, No. 11-cv-01380, 2012 WL 5332201, at

*12 (D. Colo. Oct. 29, 2012); *Advantage Home Building, LLC v. Maryland Cs. Co*., 470 F.3d

1003, 1011 (10th Cir. 2006)).

AXIS contends that the decision in *Arch Specialty Insurance* is also flawed because the state court improperly relied on policy language which provides that work will be deemed completed even though it "may need service, maintenance, repair or replacement," and the court ignored other relevant language in the policy. (*Id*. at 4-5). AXIS alleges that the state court's reliance on the relevant policy language - that "work that may need service, maintenance, correction, repair or replacement will be treated as completed"- failed to include a key component of the policy provision. The policy provision actually reads in full:

> Work that may need service, maintenance, correction, repair or replacement, *but which is otherwise complete*, will be treated as completed.

(*Id*. at 5)(emphasis added). AXIS contends that in interpreting this portion of the policy and ignoring the requirement that work be "otherwise complete," the state court violated an established principle of Ohio contract construction, which requires the court to harmonize and give effect to all words and provisions in a contract if possible.

AXIS's arguments against adopting and applying the decision in *Arch Specialty Insurance* in this matter are not well-taken. First, AXIS has not provided a cogent argument for why the state court's subsequent decision impacts the substantive analysis and the merits of its initial summary judgment decision so as to foreclose this Court from relying on the state court's analysis and holding. The summary judgment decision in *Arch Specialty Insurance* was based on stipulated facts and exhibits. The state court subsequently issued an order dated January 15, 2016, that addressed a damages dispute over whether the summary judgment decision applied to certain claims (the Nazario claims) asserted by the plaintiffs. The defendant Arch argued that those claims must be excluded because the facts of the incident in question were outside the definition of "products-completed operations hazard" in the applicable policy. The state court found that the defendant Arch had not presented any evidentiary material on the factual basis of

the Nazario claims until after summary judgment had been rendered.  Thus, the court found the

Nazario claims were included in its summary judgment order.  The state court's decision

affirming that certain claims were included in its summary judgment order does not impact the

merits or precedential value of the state court's original decision on summary judgment.

Further, the Court rejects as unsupported AXIS's contention that subsection (2)(c) of the

products-completed operations hazard is not meant to apply to situations like those presented in

*Arch Specialty Insurance* or here, but instead it is intended to apply to situations such as "a large

construction site involving multiple sections or stages."  (Doc. 33 at 3).  The state court in *Arch*

*Specialty Insurance* interpreted the provision as "clearly includ[ing] the situations such as the

ones at issue" in that case, i.e., elevator equipment with uncompleted "maintenance or service

contracts."  (Doc. 25, Exh. 4 at 6).  AXIS has not cited any Ohio case law that interprets the

policy language in a contrary manner or holds that it does not logically apply in such

circumstances.

Moreover, the Court finds that AXIS's argument that subsection (2)(c) is not intended to

apply in this context is inconsistent with other representations AXIS has made in its filings.  In

its memorandum in opposition to plaintiffs' motion for summary judgment, AXIS implicitly

concedes that subsection (2)(c) would apply to Fujitec's work under the MSA *if* Fujitec had

performed "repair" work on equipment that was allegedly the proximate cause of an injury.

(Doc. 33 at 8-9).  AXIS states in its response:

> In the case at bar, Fujitec never performed any actual maintenance services on the
> cables that allegedly proximately caused the Shannon accident.  These
> distinguishing facts are significant as the plaintiff [sic] in the Shannon litigation
> claim that Fujitec's ongoing 'inspection' obligations should have placed them on
> notice of the need to replace the involved cables and had they replaced the cables
> per their obligation under the contract, the accident would have never occurred.
> Indeed, Defendant will concede that if Fujitec had actually performed and
> completed any repair work on the elevator equipment alleged to be the proximate

> cause of Shannon's injuries before the Shannon incident, the accident in issue
> would be properly construed as falling within the Products-Completed Operations
> coverage. Under such hypothetical facts, Fujitec's work could be legitimately
> characterized as 'otherwise complete,' because work would have been actually
> performed.

(Doc. 33 at 9). Under AXIS's hypothetical scenario, if Fujitec had performed some work on the elevator equipment that led to an alleged injury, and the equipment was then put to its intended use, the "work" would be "otherwise complete" and would fall under the products-completed operations hazard. Thus, AXIS does not deny that subsection (2)(c) of the provision could apply to elevator equipment subject to a maintenance service contract. AXIS simply disagrees as to whether Fujitec had actually performed any work under the MSA at the time of the Shannon incident. AXIS's hypothetical is inconsistent with its argument that subsection (2)(c) is not intended to apply outside the context of a large construction site to be completed in multiple stages. AXIS has not shown that the state court in *Arch Specialty Insurance* improperly applied subsection (2)(c) of the products-completed operations provision to the facts before it.

Nor does the record support AXIS's argument that *Arch Specialty Insurance* does not apply here because Fujitec completed no "work," as described in the MSA. First, AXIS makes inconsistent arguments as to what constitutes "work" under the MSA. In its motion for summary judgment, AXIS asserts "there is no question that Fujitec's contractually defined 'work,' included *periodic inspections* to identify any parts in need of repair and replacement and to perform any required repair." (Doc. 29 at 17)(emphasis added). AXIS acknowledges that Fujitec had obligations to "*inspect*, repair, and replace worn out equipment under the terms of the [MSA]. . . ." (*Id.*)(emphasis added). AXIS contends that because Fujitec's "*inspection*, repair, and replacement responsibilities under the [MSA] had not been 'completed'" upon "the last inspection" of the elevator equipment prior to the Shannon incident, the claim does not come

within the purview of the products-completed operations hazard. (*Id.*)(emphasis added). AXIS thus indicates in its motion that "inspections" fall with the purview of "work" under the MSA. However, in response to plaintiffs' motion for summary judgment, AXIS excludes "inspections" from the scope of "work" required under the MSA. (Doc. 33 at 3-4). AXIS contends that no "work" in the form of repairs had ever been performed on Elevator P14 before the accident, and consequently no "work" had ever been completed under the terms of the completed operations provision. (*Id.*).

Plaintiffs argue that the distinction AXIS tries to draw between "work" in the form of repairs and Fujitec's other obligations under the MSA is not material. (Doc. 34 at 4-5). Plaintiffs assert there is a "significant distinction" between "maintenance" and "repairs" in that Fujitec was required to perform regular maintenance under the contract, whereas Fujitec was bound to make repairs only when "conditions warrant it." (Doc. 34 at 4). But Fujitec argues that both maintenance and repairs constitute "work" as contemplated under the MSA. (*Id.* at 3-5).

The Court agrees that AXIS's attempts to categorize the various types of "maintenance service" required under the MSA as "work" and something other than work is not valid. The MSA called for Fujitec to provide "maintenance service to maintain and repair elevators. . . ." (Doc. 25, Exh. 3 at 1). The MSA identifies the "maintenance service" that Fujitec agreed to "furnish" under the MSA as to "maintain elevator Equipment . . . using trained maintenance personnel . . . [and] employ all reasonable care to see that Equipment is maintained in proper operating condition"; "regularly examine, maintain, lubricate, adjust, clean as required, and, if in [Fujitec's] reasonable judgment the conditions warrant it, repair or replace all elevator components, unless specifically excluded elsewhere"; "maintain the existing performance of Equipment"; and perform the "[m]aintenance, repair and replacement of items" listed. (Doc. 25,

Exh. 3, § 1, § 5 per Exh. C).  The only distinction the MSA draws between inspections and repairs is that inspections (and regular maintenance services) were to be performed "regularly," while repairs and replacement services were to be performed when "conditions warrant it."  (*Id*.). AXIS does not explain why these services should variously be categorized as "work" and something other than "work" on this basis.  Under the terms of the MSA, the different types of maintenance service that Fujitec was to provide, including inspections, regular maintenance services, repairs, and replacement of components, are properly characterized as "work."

AXIS's argument that only "repairs" are correctly characterized as "work" finds no support under the MSA.  Just as the MSA does not draw a distinction between different types of "work," AXIS does not point to any language in the Travelers Policy which suggests that the policy distinguishes between different types of "maintenance service" under the MSA so that some types were to be treated as "work" and other types were to be treated as something else. *See Liberty Surplus Ins. Corp. v. Norfolk S. Ry. Co.*, 684 F. App'x 788, 789 (11th Cir. 2017). The Travelers Policy broadly defines "work" and does not draw the distinctions AXIS urges. (*See* Doc. 4, Exh. A at 24, "Section V-Definitions" at ¶ 22) ("Your work" means "work or operations performed by you. . . .")

The Eleventh Circuit's decision in *Liberty Surplus* is instructive in this regard.  The policy in *Liberty Surplus* provided coverage for "bodily injury" or "property damage" arising out of acts related to the "work" described in the declarations.  *Id*. at 791.  The policy defined "work" as it was described in the contractor's contract, which in turn defined the work as maintaining and monitoring several railroad crossings throughout the length of the contract.  *Id*. at 791-92.  The court found there was "nothing within the language of the Policy, or the Exclusion itself, which suggests distinguishing between 'different concepts of work' within the

same provision is appropriate. . . . [T]he plain and unambiguous language of the exclusion requires the Court apply the same definition and concept of 'work' to subsections (2) and (3) of the Completed Work Exclusion as Liberty agrees applies to subsection (1). . . ." *Id*. at 791, 793. The same reasoning applies here. Because there is no basis for construing certain aspects of Fujitec's contractually-required maintenance obligations as "work" and others as something else, these maintenance obligations must all be construed as "work" under each provision of the products-completed operations hazard. *See also Goodwin v, Wright*, 100 Wash. App. 631, 642 (2000) (quoting Webster's Third New International Dictionary of the English Language 2634 (1993) ("the dictionary definition [of work], 'an activity in which one exerts strength or faculties to do or perform,' easily embraces a spectrum of service-oriented businesses.")).

Thus, *Arch Specialty Service* cannot reasonably be distinguished from this case on the ground that "work" under the Travelers Policy carries a meaning that limits it to "repairs" performed under the MSA, and Fujitec had not performed any "work" as of the date of the Shannon incident. The parties do not dispute that while there is no evidence that repairs were performed on Elevator P14 prior to the Shannon incident, Fujitec personnel had inspected the elevator at some point. (Doc. 25, Exh. 5, Carlos Aff., ¶ 3 - according to Fujitec's records, no repairs were performed on Elevator P14 from June 30, 2011 to December 29, 2011; *Id*., ¶ 2 - "Fujitec had performed monthly maintenance on the elevator in which Shannon claims to have been injured"; Doc. 26, Day depo. at 3, 11, 16 - Elevator P14 was inspected prior to the Shannon incident). Thus, "work" within the meaning of the MSA and Travelers Policy, i.e., an inspection, was performed on the elevator prior to the Shannon incident.

The next question to be answered is whether "[Fujitec's] work" which purportedly caused Shannon's bodily injury and gave rise to the claim for coverage against Travelers was

"completed" within the meaning of the products-completed operations hazard provision of the Travelers Policy when the Shannon incident occurred. The state court's decision in *Arch Specialty Insurance*, Case No. 14CV85245, is controlling on this question. The state court addressed and resolved the issue of whether the contractor's "work," which it construed as the equipment and the maintenance obligations, was "completed" under subsection (2)(c) of the products-completed operations hazard provision: "When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project." The court found that the policy was unambiguous and stated that "work" that may need "service, maintenance, correction, repair or replacement will be treated as completed" and coverage will be provided when that part of the "work" done at a job site has been put to its intended use. *Id.* at 6. The state court framed the issue before it as: "what is included in the term 'products-completed operations hazard' and whether equipment with uncompleted maintenance agreements is included in the 'products-completed operations' definition." *Id.* at 4. The court answered that question by finding that the "products" that resulted in injury were all "completed and being put to their intended use and were only being serviced and maintained but were otherwise complete at the time of the injuries." *Id.* In accordance with the court's decision in *Arch Specialty Insurance*, Fujitec's work in this case was "completed" when that "part of the work" - the allegedly improper inspection and maintenance of the elevator cable prior to the Shannon accident - had "been put to its intended use." Based on the undisputed facts, maintenance and inspection work had been performed on the elevator equipment pursuant to the MSA and the elevator has been put to its intended use as of the date of the Shannon accident. Thus, the Shannon action falls within the purview of the products-completed operations hazard.

AXIS has not cited any other Ohio case that counsels against following *Arch Specialty Insurance* in this matter.  The Ohio decisions AXIS discusses involve substantially different facts and rely on case law that is not applicable to the factual circumstances presented here.

First, AXIS cites an Ohio appellate court decision for the proposition that to determine whether a claim falls within a products-completed operations hazard,  the proper focus is on the "scope of services" to be provided under the contract and whether "all contracted work" had been completed.  (Doc. 33 at 7, citing *Acme Steak Co., Inc. v. Great Lakes Mech. Co.*, Nos. 98-C.A.-146, 98-C.A.-243, 2000 WL 1506199 (Ohio App. 7th Dist. Sept. 29, 2000)).  AXIS argues that under this analysis, Fujitec's work was not "completed" or "otherwise completed" because Fujitec had "never effectuated any work on the elevator equipment at issue. . . ." (*Id*.).  The Court disagrees.  For the reasons explained *supra*, the undisputed facts show that Fujitec had performed "work" as defined in the MSA on the elevator equipment involved in the Shannon accident.  Therefore, the decision in *Arch Specialty Insurance* is on point.  Applying the analysis in *Arch Specialty Insurance* to the undisputed facts of this case leads to the conclusion that when the Shannon accident occurred, the "work" at issue had "been put to its intended use" and was "completed" within the meaning of subsection (2)(c) of the products-completed operation hazard provision of the Travelers Policy.  The fact that Fujitec was bound to perform maintenance service under the MSA for the duration of the contract does not alter the conclusion that the work was "completed" as defined under the terms of the Travelers Policy.  Although maintenance service "work" remained to be performed under the MSA, the "work" that had been performed on Elevator P14 prior to Shannon's accident was "otherwise complete."

AXIS discusses a second Ohio appellate decision that plaintiff relies on, but which AXIS argues supports its position.[5] (Doc. 33 at 12-13, citing *Hoover v. Sumlin*, No. 7570, 1982 WL 3725 (Ohio App. 2nd Dist. April 21, 1982)). The Court disagrees and finds *Hoover* has no relevance to this case. *Hoover* involved the same products-completed operations hazard provision at issue here, but the facts before the court in *Hoover* differ substantially from the facts in this case. The insured in *Hoover* had completed his contractual obligations to install sewer and water lines to a residence at the time of the accident, which involved a trench the insured had dug across the public road. An obligation to maintain the trench until the road could be repaved was imposed by a township regulation, not the parties' contract. The court in *Hoover* found that the policy "clearly and specifically did not provide coverage past its definition of completed operations" and did not provide coverage for the accident. *Id.* at *4. *Hoover* did not involve a maintenance contract, and the court did not analyze the issue before this Court, i.e., whether "part of the work" had been "put to its intended use" and was therefore "completed" as defined under the products-completed operation hazard when the accident occurred.

AXIS relies on numerous additional cases to support its position that the holding in *Arch Specialty Insurance* does not apply here, and specifically to argue that Fujitec's work was not "completed" and was not "otherwise complete" within the meaning of the products-completed operations hazard when the Shannon incident occurred.[6] (Doc. 29 at 17-19). The case that

---

[5] Plaintiffs cited *Hoover* to show that "an insured's work is [] complete when an agreement to maintain remains in effect after the alleged bodily injury is sustained." (Doc. 25 at 16).

[6] AXIS cites some cases for the proposition that the products-completed operations hazard does not apply because no work was ever completed on Elevator P14. (Doc. 33 at 4). The Court need not address these cases insofar as they support the proposition that the "products-completed operation hazard" in the Travelers Policy covers "completed work," which the parties do not dispute, but fail to provide additional insight into whether Fujitec's work was "completed" within the meaning of the Travelers Policy. *See Am. Family Ins. Co. v. Apt. Builders, LP*, No. 11-cv-01380, 2012 WL 5332201, at *5 (D. Colo. Oct. 29, 2012); ("The products-completed operation hazard, as its name implies, only covers completed work."); *Advantage Home Building, LLC v. Maryland Cs. Co.*, 470 F.3d 1003, 1011 (10th Cir. 2006) (there was no duty to indemnify for the losses alleged by plaintiffs because the physical damage had occurred during the course of the work and before it was complete).

AXIS argues "is most directly on point with the situation" at issue here is *McNally v. American States Ins. Co.,* 308 F.2d 438 (6th Cir. 1962). (*Id.* at 17). AXIS asserts that *McNally* involved an elevator service contract similar to the MSA and also involved similar insurance coverage.

In *McNally*, the insured operated an elevator service business, and the insurance policy provided coverage for bodily injury or property damage caused by accidents arising out of the hazards defined in the policy, which included the "ownership, maintenance or use of premises, and all operations." *Id.* at 440. Several passengers were injured in an accident that occurred on an elevator serviced by the insured. The insurer alleged that coverage was excluded under the "Products-Completed Operations" provision of the policy, which covered the following hazards: (1) goods or products manufactured or handled by the insured that had been relinquished to others if the accident occurred away from premises owned, rented, or controlled by the insured; and (2) "operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed . . . ." *Id.* at 441. The insurer alleged that the hazard in issue fell under that part of the policy, and the insured had not purchased such coverage. *Id.*

The Sixth Circuit rejected the insurer's position that coverage was excluded because the hazard was covered under the Products-Completed-Operations provision, and the insured had not purchased such coverage. The Court found the claims in issue were a hazard that the insured was protected against, and the "Products-Completed-Operations" provision did not apply so as to exclude coverage. *Id.* at 442. The Sixth Circuit devoted the bulk of its opinion to an analysis of whether the Products-Completed-Operations provision related to "products liability" coverage. *Id.* at 441-44. The Sixth Circuit adopted the district court's finding that the provision was

ambiguous and, because it operated as an exclusion under the circumstances of the case, any ambiguity had to be construed against the insurer. The Court found that "'Products-Completed-Operations' should, in the context of the case, be read as providing 'products liability coverage,' a coverage not applicable" to the insured's elevator servicing business. *Id*. at 441-42. Because the "Products-Completed-Operations" coverage was not applicable, its exclusion from the policy had no effect on the insured's hazard coverage for its operations. *Id*. at 442.

Having construed the "Products-Completed-Operations" provision as inapplicable to the liability asserted against the insured in *McNally*, there was no need for the Sixth Circuit to interpret the meaning of "completed operations" in the provision. The Court went on, however, to find no error in the district judge's conclusion that the services performed by the insured "did not end after each weekly inspection, and thereupon become 'completed operations.'" *Id*. at 444. The Court stated:

> The language of subdivision (2) which says that operations shall not be 'deemed incomplete' . . . because further operations may be required pursuant to an agreement does not make that which is incomplete in fact, complete. A fair interpretation of the intendment of such language was merely to provide that which was, in fact, complete, would not be made incomplete because a further operation may be required, such as, for illustration, an obligation of the installer of a furnace to readjust it at the end of a stated period, if required by the purchaser. . . . . In this view of 'completed operations,' Division 4 [Products-Completed-Operations] does not apply as an exclusion, even if we indulge defendant's claim that the caption words 'Completed Operations' and subdivision (2) of Division 4 are to be read as unrelated to 'products liability.'

*Id*.

AXIS argues that this analysis likewise applies here, asserting: "The mere fact that the Travelers policy indicating that work may be deemed completed even though 'work that may need service, maintenance, correction or repair, or replacement, but which is otherwise complete' does not make that which has not been completed, complete." (Doc. 29 at 19). AXIS argues, "Just as the *McNally* court concluded that the insured's operations were not concluded or

'complete' after each weekly inspection required under the service contract, Fujitec's obligations under its service contract to inspect and repair work parts was not 'completed' upon Fujitec's last inspection before the *Shannon* incident"; instead, "Fujitec's obligation to inspect and repair and replace work equipment was a continuous obligation. . . ." (*Id.* at 19-20). AXIS argues that the "otherwise complete" language in *McNally* does not differ substantively from the comparable provision in the Travelers Policy, and the Court should reach the same result in this case and find Fujitec's work was not "otherwise complete." (Doc. 35 at 2-3).

Plaintiffs argue that *McNally* is inapposite to this case. (Doc. 32 at 1-5). First, plaintiffs note that the Sixth Circuit found the policy provision was ambiguous so that it had to be construed liberally in favor of the insured. (*Id.* at 2, citing *McNally*, 308 F.2d at 445). Plaintiffs allege that "the clear trend of courts interpreting Travelers' post-1966 language [when insurance industry changes occurred] has been to find it unambiguous." (*Id.* at 4, citing *Goodwin*, 100 Wash. App. at 643-644) ("While the arguments have differed, courts in other jurisdictions faced with ambiguity challenges to the standard language of post-1966 products-completed operations exclusions have held that language unambiguous."); *Arch Specialty Insurance*, Case. No. 14CV85245 at 6; *James*, 981 F.2d 810). Further, plaintiffs contend that the completed operations language in *McNally* is very different from the products-completed operations hazard provision in the Travelers Policy. (*Id.* at 2). Plaintiffs contend that the Travelers Policy defines terms that are left undefined in the *McNally* policy, including "hazard," "Your work," and when "work" or an "operation" is deemed "completed." (*Id.* at 2-5). Plaintiffs also contend that the Travelers Policy clearly provides that if Fujitec's work had been put to its intended use - as it had been in the Shannon action - before all the work called for in the service contract had been performed - inspection and maintenance of Elevator P14 in this matter- then the work is deemed

complete.  (*Id*. at 5).  Plaintiffs argue that Fujitec's ongoing obligations under the MSA do not alter this result given the clause in the products-completed operations hazard provision stating: "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."  (*Id*.).

The Court agrees with plaintiffs that the Sixth Circuit's decision in *McNally* is not on point.  The policy language in *McNally* differs materially from the policy language at issue here.  Whereas the Sixth Circuit in *McNally* found the policy language was ambiguous and was in effect an exclusion which had to be construed against the insurer, the state court in *Arch Specialty Insurance* found that the policy language at issue in the Travelers Policy is not ambiguous.  Further, unlike the Travelers Policy, the policy in *McNally* did not define when work is "completed."  The *McNally* decision is therefore not material to the resolution of when Fujitec's work was "complete" as that term is defined under the products-completed operations hazard provision in the Travelers Policy.

AXIS also relies on the Eighth Circuit's decision in *Bituminous Cas. Corp. v. R & O Elevator Co.*, 293 F.2d 179, 183 (8th Cir. 1961) as support for its position that Fujitec's work under the MSA was not completed as of the date of the Shannon incident.  (Doc. 29 at 20-21).  Like *McNally*, *Bituminous* involved an elevator service contract that provided coverage for the liability arising from the insured's elevator servicing operations.  The court found that "the insured's function of servicing the elevator was not completed in any sense by the work its employees had performed upon the elevators and there could be no exclusion from coverage on account of 'completed operations.'"  *Id*. at 185.  The Eighth Circuit's decision is not persuasive authority in this matter for the same reasons the decision in *McNally* is not on point.  The Eighth

32

Circuit did not analyze policy language like that at issue here to determine when "work" under a service contract is deemed "completed."

Finally, AXIS cites non-Ohio cases to highlight the importance of the "otherwise complete" language in the products-completed operations hazard provision. (Doc. 33 at 5-7, citing *Secura Ins. Co. v. Gray Const., Inc.,* 717 F. Supp. 2d 710, 720 (W.D. Ky. 2010) (applying subsection (2)(c) and finding that because a mixing room - i.e., the portion of contract work which caused the injury or damage - had not been put to its intended use as of the date in issue, the work was not "completed"); *Bresee Homes, Inc. v. Farmer's Ins. Esch.,* 353 Ore. 112, 122-123 (2012) (summary judgment was improper in duty to defend case because the allegations of the underlying claim, based on the alleged failure to install flashing properly on a custom home, did not indicate whether the contractor's "work was 'otherwise complete'" or whether additional "service, maintenance, etc." may be required in order for the work to be regarded as complete). Neither of these cases is on point. Unlike the present case, neither *Secura* nor *Bresee* involved an ongoing maintenance service contract. The decisions therefore do not address when "part of the work" under an ongoing services contract has been "put to its intended use." *Secura* and *Bresee* are not helpful to the resolution of this case.

## IV. Conclusion

The parties do not dispute that at the time of the Shannon incident, *all* of the work called for in Fujitec's MSA had not been completed so as to satisfy subsection (2)(a) of the "products-completed operations hazard" provision of the Travelers Policy. Nor do the parties dispute that subsection (2)(b) of the provision was not applicable because the MSA did not call for work at more than one job site. The parties dispute only whether "that part of the work done at [the] job site ha[d] been put to its intended use" within the meaning of subsection (2)(c) of the provision.

The Court finds that the Ohio court's decision in *Arch Specialty Insurance* is dispositive of this issue. Applying the state court's decision to the facts of this case leads to the conclusion that Fujitec had completed "part of the work" on Elevator P14 and the work had been put to "its intended use" on the date of the Shannon incident. The fact that Elevator P14 was subject to further maintenance and service under the MSA does not change the nature of Fujitec's "otherwise completed" work. Fujitec's work under the MSA which allegedly gave rise to Shannon's injury was "completed" on the date the Shannon incident occurred. The Shannon claim falls under the "Products-completed operations hazard" of the Travelers Policy and is subject to the $2 million Products-Completed Operations Aggregate Limit.

### IT IS THEREFORE ORDERED THAT:

1. Plaintiffs' motion for summary judgment (Doc. 25) is **GRANTED** and defendant AXIS's cross-motion for summary judgment (Doc. 29) is **DENIED**.

2. Defendant AXIS shall reimburse plaintiffs for the damages plaintiffs have incurred to date in defending the Shannon lawsuit, *Robert E. Shannon, Jr. v. The New York Times Building, LLC, et al.*, Index No. 150709/12.

3. A declaratory judgment is issued in favor of plaintiffs declaring that defendant AXIS is required to defend, or to pay all defense costs plaintiffs will incur going forward in defending, the Shannon action.

Date: ___5/1/2020___

Karen L. Litkovitz
United States Magistrate Judge